**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>ROBERTSHAW US HOLDING CORP., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-90052 (CML)<br><br>(Joint Administration Requested) |
| ROBERTSHAW US HOLDING CORP., RANGE PARENT, INC., BAIN CAPITAL CREDIT, LP., CANYON CAPITAL ADVISORS LLC, and EATON VANCE MANAGEMENT,<br><br>Plaintiffs,<br><br>v.<br><br>The Guardian Life Insurance Company of America; Park Avenue Institutional Advisers CLO Ltd. 2016-1; Park Avenue Institutional Advisers CLO Ltd. 2017-1; Park Avenue Institutional Advisers CLO Ltd. 2018-1; Park Avenue Institutional Advisers CLO Ltd. 2019-1; Park Avenue Institutional Advisers CLO Ltd. 2019-2; Marathon CLO V Ltd.; Marathon CLO VI Ltd.; Marathon CLO IX Ltd.; Portman Ridge Finance Corp.; Regatta VII Funding Ltd.; Regatta VIII Funding Ltd.; Regatta IX Funding Ltd.; Regatta X Funding Ltd.; Regatta XI Funding Ltd.; Regatta XII Funding Ltd.; Regatta XIII Funding Ltd.; Regatta XIV Funding Ltd.; Regatta XV Funding Ltd.; Regatta XVI Funding Ltd.; Regatta XVII Funding Ltd.; Regatta XVIII | Adv. Pro. No. 24-_____ (___) |

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are as follows: Range Parent, Inc. (7956); Robertshaw US Holding Corp. (1898); Robertshaw Controls Company (9531); Burner Systems International, Inc. (8603); Robertshaw Mexican Holdings LLC (9531); Controles Temex Holdings LLC (9531); Universal Tubular Systems, LLC (8603); and Robertshaw Europe Holdings LLC (8843). The primary mailing address used for each of the foregoing debtors is 1222 Hamilton Parkway, Itasca, Illinois 60143.

Funding Ltd.; Regatta XX Funding Ltd.; :
Regatta XXI Funding Ltd.; Regatta XXII :
Funding Ltd.; Regatta XXIII Funding Ltd.; :
Regatta XXIV Funding Ltd.; Z Capital Credit :
Partners CLO 2018-1 Ltd.; and Z Capital :
Credit Partners 2019-1 Ltd.

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT

Debtors Robertshaw US Holding Corp. ("**Robertshaw**" or the "**Company**") and Range Parent, Inc. ("**Range Parent**"), as well as Bain Capital Credit, LP, on behalf of certain of its managed funds ("**Bain Capital**"), Canyon Capital Advisors LLC, on behalf of certain of its managed funds ("**Canyon Capital"**) and Eaton Vance Management, on behalf of certain of its managed funds ("**Eaton Vance,**" and together with Bain Capital, and Canyon Capital, the "**Lender Plaintiffs**", and together with Robertshaw, Ranger Parent, and the Lender Plaintiffs, the "**Plaintiffs**"), file this adversary complaint (the "**Complaint**") pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") against Defendants The Guardian Life Insurance Company of America, Park Avenue Institutional Advisers CLO Ltd. 2016-1, Park Avenue Institutional Advisers CLO Ltd. 2017-1, Park Avenue Institutional Advisers CLO Ltd. 2018-1, Park Avenue Institutional Advisers CLO Ltd. 2019-1; Park Avenue Institutional Advisers CLO Ltd. 2019-2; Marathon CLO V Ltd.; Marathon CLO VI Ltd.; Marathon CLO IX Ltd.; Portman Ridge Finance Corp.; Regatta VII Funding Ltd.; Regatta VIII Funding Ltd.; Regatta IX Funding Ltd.; Regatta X Funding Ltd.; Regatta XI Funding Ltd.; Regatta XII Funding Ltd.; Regatta XIII Funding Ltd.; Regatta XIV Funding Ltd.; Regatta XV Funding Ltd.; Regatta XVI Funding Ltd.; Regatta XVII Funding Ltd.; Regatta XVIII Funding Ltd.; Regatta XX Funding Ltd.; Regatta XXI Funding Ltd.; Regatta XXII Funding Ltd.; Regatta XXIII Funding Ltd.; Regatta XXIV Funding Ltd.; Z Capital Credit Partners CLO 2018-1 Ltd.; and Z Capital Credit Partners 2019-1 Ltd. (collectively, the "**Defendants**"). As the basis for the Complaint, Plaintiffs state as follows:

## NATURE OF THE ACTION

1. This adversary proceeding arises out of a series of transactions that Robertshaw executed in May 2023 in an effort to address its liquidity needs (the "**May 2023 Transactions**").

Although the May 2023 Transactions complied with the terms of all relevant credit agreements, Defendants have nonetheless put the transactions in dispute by filing suit against Robertshaw, Range Parent, and certain participating lenders (including funds managed by Bain, Canyon and Eaton Vance) in the Supreme Court of the State of New York (the "**Guardian Action**" before the "**New York State Court**"). In that suit, filed over six months after the Transactions closed, Defendants seek, among other things, a declaratory judgment that the May 2023 Transactions were invalid. While that suit has been stayed as to the Debtors upon the commencement of these chapter 11 cases (the "**Chapter 11 Cases**"), the Debtors cannot emerge from bankruptcy until Defendants' claims, which challenge the validity of liens against certain of the Debtors' assets, are adjudicated.

2. The key facts are not in dispute. In 2018, Robertshaw entered into two credit agreements: the "First-Lien Credit Agreement" and the "Second-Lien Credit Agreement" (together, the "**Original Credit Agreements**"). Through these Original Credit Agreements, Robertshaw issued approximately $620 million in secured first-lien and second-lien debt to various lenders, including the Defendants (the "**Original Lenders**"). The Original Credit Agreements allowed virtually all provisions to be amended, modified, or waived by Robertshaw with the consent of lenders holding more than 50% of the outstanding loans under each Original Credit Agreement (the "**Required Lenders**"). The sole exception to that rule was a narrow set of so-called "sacred rights" specifically enumerated in Section 9.02(b)(A) of the Original Credit Agreements, for which modification required the consent of each lender "directly and adversely affected thereby."

3. After the effects of the COVID-19 pandemic disrupted Robertshaw's business, the Company, in need of liquidity, returned to the lending market. Robertshaw canvassed the market for potential new money deals and received several proposals, including from third parties and at

least one of the Defendants. Robertshaw and its advisors considered each proposal and negotiated potential terms with several parties. This competition allowed the Company to leverage proposals against one another and resulted in increasingly competitive terms. Ultimately, after considering all available options, the Company determined that a financing negotiated with certain of its existing lenders was its best path forward. In May 2023, Robertshaw entered into a new credit agreement (the "**Super-Priority Credit Agreement**" or "**SPCA**") with an ad hoc group of Original Lenders (and/or investment advisors of Original Lenders) represented by Gibson, Dunn & Crutcher LLP and Greenhill & Co., Inc. and holding more than 50% of the loans under each Original Credit Agreement (the "**Ad Hoc Group**").

4. Through the series of May 2023 Transactions, the parties obtained critical additional liquidity, namely $95 million in new money through a new first-out facility under the SPCA. As part of the May 2023 Transactions, the Ad Hoc Group also sold their existing loans under the Original Credit Agreements to Robertshaw at par in exchange for second-out and third-out facilities under the SPCA. The parties also offered *all* other Original Lenders the option to sell their holdings at par in exchange for new second-out, third-out, fourth-out, and fifth-out facilities under the SPCA. Any Original Lender that declined to participate in the May 2023 Transactions would hold debt junior to any issued under the SPCA. While many lenders chose to participate, Defendants chose not to do so.

5. To facilitate the May 2023 Transactions, Robertshaw and the Ad Hoc Group, acting as Required Lenders, amended the Original Credit Agreements to: (a) remove or modify covenants in the Original Credit Agreements to avoid any potential breach; and (b) extend the period to cure a late interest payment to avoid a potential Event of Default. No amendments were made to any of the "sacred rights" enumerated within the Original Credit Agreements that would have required

Defendants' approval, nor were any such sacred rights provisions implicated by the May 2023 Transactions. Because Required Lenders consented, the May 2023 Transactions complied with the terms of the Original Credit Agreements. In fact, the May 2023 Transactions mirror a set of transactions this Court recently upheld under a nearly identical credit agreement.[2]

6. Despite that fact, more than six months after the May 2023 Transactions closed, Defendants filed a complaint against Robertshaw, Range Parent, One Rock Capital Partners, LLC ("**One Rock**"), and the Ad Hoc Group in New York State Court.[3] On January 12, 2024, Defendants filed an amended complaint that accuses Robertshaw of breaching the Original Credit Agreements and the implied covenant of good faith and fair dealing, and issuing fraudulent transfers to the Ad Hoc Group.[4] Defendants seek declarations that the amendments to the Original Credit Agreements are void and that an Event of Default has occurred under the Original Credit Agreements. None of these claims has merit.

7. Defendants are highly sophisticated investors that willingly entered into the Original Credit Agreements, which are so-called "loose" lending documents that gave Robertshaw broad discretion to amend terms with the approval of Required Lenders. It is undisputed that Robertshaw obtained that approval before amending the Original Credit Agreements and executing the May 2023 Transactions. Yet Defendants, who represent a minority of lenders, now effectively seek to rewrite the Original Credit Agreements to permit them to block transactions that the

---

[2] *See* Order on Summary Judgment, *In re Serta Simmons Bedding, LLC*, Adv. Pro. No. 23-09001, Dkt. Nos. 141 and 142 (Bankr. S.D. Tex. Apr. 6, 2023); *In re Serta Simmons Bedding, LLC*, 2023 WL 3855820 (Bankr. S.D. Tex. June 6, 2023).

[3] *See The Guardian Life Insurance Company, et al. v. Robertshaw US Holding Corp. et al.*, Index No. 655979/2023 (Sup. Ct. N.Y. Cnty.).

[4] The amended complaint names as defendants certain funds managed by members of the Ad Hoc Group at the time (Bain Capital, Canyon Capital, Eaton Vance, and Invesco Senior Secured Management, Inc. ("**Invesco**")) as well as One Rock Capital Partners.

Original Credit Agreements expressly allowed Required Lenders alone to authorize. Defendants cannot do so.

8. The Guardian Action was stayed as to Robertshaw and Range Parent pursuant to section 362 of the Bankruptcy Code (as defined below) upon commencement of these Chapter 11 Cases. However, the claims asserted by Defendants against the Ad Hoc Group and One Rock directly implicate the Debtors' estates by challenging "the validity, priority, or extent of a lien" in the Debtors' assets. Moreover, certain of those claims are now property of the Debtors' estates under the Bankruptcy Code, including the fraudulent transfer claims. In order for Debtors to successfully emerge from these Chapter 11 Cases, several questions central to the Guardian Action must be resolved. Robertshaw and Range Parent, along with the other Plaintiffs, are therefore compelled to bring this adversary proceeding to confirm the validity of the SPCA and the amendments to the Original Credit Agreements. Plaintiffs seek:

- A declaratory judgment that the May 2023 Transactions were permitted under the Original Credit Agreements and Plaintiffs are therefore not in breach of contract;
- A declaratory judgment that no Event of Default has occurred under the Original Credit Agreements;
- A declaratory judgment that no payments made by Robertshaw to the Ad Hoc Group pursuant to the May 2023 Transactions constitute fraudulent transfers under the New York Uniform Voidable Transactions Act;
- A declaratory judgment confirming that the automatic stay under section 362(a) of title 11 of the United States Code (the "**Bankruptcy Code**") applies to bar further

prosecution of the Guardian Action against the Lender Plaintiffs or, in the alternative, can be and is extended to those Lender Plaintiffs; and

- To enjoin the Guardian Action pursuant to section 105(a) of the Bankruptcy Code, to the extent the Guardian Action is not completely barred by the automatic stay.[5]

9. As discussed herein, in the Motion, and in the First Day Declarations,[6] the automatic stay applies to the Lender Plaintiffs because the Guardian Action against the Lender Plaintiffs is "an[] act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Defendants seek to exercise control over the property of the Debtors' estate by challenging the validity of SPCA.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b).

11. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

12. This adversary proceeding is commenced pursuant to (a) Rule 7001(2) of the Bankruptcy Rules, which allows for a proceeding "to determine the validity, priority, or extent of a lien or other interest in property;" (b) Rule 7001(7) of the Bankruptcy Rules, which allows for a proceeding "to obtain an injunction or other equitable relief;" (c) Rule 7001(9) of the Bankruptcy

---

[5] In the alternative, the Court may grant a stay pursuant to the "inherent power of courts under their general equity powers and in the efficient management of the dockets to grant relief." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1003 (4th Cir. 1986); *see also Jonas v. Newman (In re Comark)*, 53 B.R. 945, 947 (Bankr. C.D. Cal. 1985) ("Under the provisions of 28 U.S.C. § 1334, in combination with § 105(a) of the Bankruptcy Code, the Bankruptcy Court has jurisdiction and power to enjoin the prosecution of actions against non-debtors where the action is related to a Title 11 case.").

[6] This Complaint is being filed contemporaneously with Debtors' Emergency Motion for Entry of an Order (A) Declaring That Automatic Stay Applies to Claims Asserted Against Non-Debtor Parties in Guardian Action or (B) Extending Automatic Stay and Preliminarily Enjoining Claims Against Non-Debtor Parties in Guardian Action (the "**Motion**") as well as the *Declaration of John Hewitt in Support of Chapter 11 Petitions and First Day Pleadings* and the *Declaration of Stephen Spitzer in Support of Chapter 11 Petitions and First Day Pleadings* (together, the "**First Day Declarations**").

Rules, which allows for a proceeding to obtain a declaratory judgment relating to the foregoing; and (d) section 105(a) of title 11 of the Bankruptcy Code. Declaratory relief is appropriate pursuant to Rule 7001 of the Bankruptcy Rules and 28 U.S.C. § 2201.

13. As set forth below, an actual legal controversy exists with respect to each of the counts brought herein.

14. Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiffs consent to the entry of a final judgment or order with respect to this Complaint if it is determined that this Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III jurisdiction of the United States Constitution.

## PARTIES

15. Plaintiff Robertshaw is a global design, engineering, and manufacturing company with its principal place of business in Itasca, Illinois, and its principal place of assets in Laredo and Brownsville, Texas.

16. Plaintiff Range Parent is a Delaware corporation with its principal place of business in Itasca, Illinois, and its principal place of assets in Laredo and Brownsville, Texas.

17. Plaintiff Bain Credit is an investment company that manages certain funds that (a) hold secured debt issued by the Debtors and (b) were named as defendants in the Guardian Action. Bain Credit is a Delaware Limited Liability Partnership.

18. Plaintiff Canyon Capital is an investment company that manages certain funds that (a) hold secured debt issued by the Debtors and (b) were named as defendants in the Guardian Action. Canyon Capital is a Delaware Limited Liability Company.

19. Plaintiff Eaton Vance is an investment company that manages certain funds that (a) hold secured debt issued by the Debtors and (b) were named as defendants in the Guardian Action. Eaton Vance is a Massachusetts Business Trust.

20. Upon information and belief, Defendant The Guardian Life Insurance Company of America is a New York mutual insurance company with its principal place of business in New York, New York.

21. Upon information and belief, Defendants Park Avenue Institutional Advisers CLO Ltd. 2016-1, Park Avenue Institutional Advisers CLO Ltd. 2017-1, Park Avenue Institutional Advisers CLO Ltd. 2018-1, Park Avenue Institutional Advisers CLO Ltd. 2019-1, and Park Avenue Institutional Advisers CLO Ltd. 2019-2 are Cayman Islands private limited companies and are collateralized loan obligations ("**CLOs**") or CLO portfolios issued, sponsored, or managed by Park Avenue Institutional Advisers LLC ("**Park Avenue**"). Upon information and belief, Park Avenue is a Delaware limited liability corporation with its principal place of business in New York, New York, and is a wholly owned subsidiary of Guardian.

22. Upon information and belief, Defendants Marathon CLO V Ltd., Marathon CLO VI Ltd., and Marathon CLO IX Ltd. Are Cayman Islands private limited companies and are CLOs or CLO portfolios issued, sponsored, or managed by Marathon Asset Management LP ("**Marathon**"). Upon information and belief, Marathon is a Delaware limited partnership with its principal place of business in New York, New York.

23. Upon information and belief, Defendant Portman Ridge Finance Corporation ("**Portman Ridge**") is a Delaware corporation with its principal place of business in New York.

24. Upon information and belief, Defendants Regatta VII Funding Ltd., Regatta VIII Funding Ltd., Regatta IX Funding Ltd., Regatta X Funding Ltd., Regatta XI Funding Ltd., Regatta XII Funding Ltd., Regatta Funding XIII Ltd., Regatta Funding XIV Ltd., Regatta Funding XV Ltd., Regatta Funding XVI Ltd., Regatta Funding XVII Ltd., Regatta Funding XVIII Ltd., Regatta Funding XX Ltd., Regatta Funding XXI Ltd., Regatta Funding XXII Ltd., Regatta Funding XXIII

Ltd., and Regatta Funding XXIV Funding Ltd. Are Cayman Islands private limited companies and are CLOs or CLO portfolios issued, sponsored, or managed by Napier Park Global Capital (US) LP ("**Napier Park**"). Upon information and belief, Napier Park is a Delaware limited liability corporation with its principal place of business in New York, New York.

25. Upon information and belief, Defendants Z Capital Credit Partners CLO 2018-1 Ltd. And Z Capital Credit Partners 2019-1 Ltd. Are Cayman Islands private limited companies and are CLOs or CLO portfolios issued, sponsored, or managed by Z Capital CLO Management LLC ("**Z Capital**"). Upon information and belief, Z Capital is a Delaware limited liability corporation with its principal place of business in New York, New York.

## FACTUAL BACKGROUND

### A. Robertshaw Enters Into The Original Credit Agreements.

26. Robertshaw is a global design, engineering, and manufacturing company. Since Frederick W. Robertshaw invented an innovative home water heater thermostat in 1899, Robertshaw has cemented itself as an industry leader, having been awarded more than 2,000 patented inventions. Today, Robertshaw sells high-quality control systems and component parts used in residential and commercial appliances, HVAC systems, and electric vehicles.

27. On January 5, 2018, private equity firm One Rock announced that it would acquire Robertshaw from its prior sponsor, Sun Capital Partners, for $900 million. To fund the transaction, on February 28, 2018, Robertshaw entered into the First-Lien Credit Agreement with certain lenders (the "**First-Lien Lenders**"), through which Robertshaw borrowed an initial aggregate principal amount of $510 million secured by first-lien interests in substantially all of Robertshaw's tangible and intangible assets. Simultaneously, Robertshaw also entered into the Second-Lien Credit Agreement with certain lenders (the "**Second-Lien Lenders**," and together with the First Lien Lenders, the Original Lenders under the Original Credit Agreements), through which

Robertshaw borrowed an initial aggregate principal amount of $110 million secured by second-lien interests in substantially all of Robertshaw's tangible and intangible assets.

28. The Original Credit Agreements contained affirmative and negative covenants that either required Robertshaw to take or prohibited Robertshaw from taking certain actions. Several of these covenants are relevant to this dispute:

- Section 2.13 required Robertshaw to make interest payments at regular intervals.
- Section 5.01 obligated Robertshaw to provide certain information, including quarterly and annual financial statements, to the Original Lenders.
- Section 6.01 restricted Robertshaw from "creat[ing], incur[ring], assum[ing], or . . . remain[ing] liable with respect to any Indebtedness."
- Section 6.02 similarly restricted Robertshaw from "creat[ing], incur[ring], assum[ing], or . . . permit[ing] to exist any Lien on or with respect to any property or asset of any kind . . . owned by it."
- Section 6.05(b) restricted "Holdings and the Subsidiaries"—but not Robertshaw as the "Borrower"—from making a "repayment or other distribution . . . on or in respect of principal of or interest on any Junior Indebtedness, or any payment or other distribution . . . on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Junior Indebtedness."

29. At the same time, however, the Original Credit Agreements also provided Robertshaw with a broad right to revise almost any provision of the Original Credit Agreements with the consent of Required Lenders. Specifically, Section 9.02(b) states that Robertshaw may "waive[], amend[] or modif[y]" any provision of the Original Credit Agreements "pursuant to an agreement or agreements in writing entered into by [Robertshaw] and the Required Lenders," *i.e.*, "Lenders having Loans or unused commitments . . . representing more than 50.0% of the sum of the total Loans[.]"

30. The only limitation on this broad amendment power is Section 9.02(b)(A), which enumerated certain so-called "sacred rights" for which amendment required approval of any lender

that would be "directly and adversely affected thereby." These sacred rights applied to amendments that seek to:

- "reduce or forgive the principal amount of any Loan" (Section 9.02(b)(A)(2));
- "change the provisions of [Section 9.02] . . . to reduce any of the voting percentages required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder" (Section 9.02(b)(A)(5)); or
- modify certain other provisions in the Original Credit Agreements in a manner that would "alter the pro rata sharing of payments required thereby" (Section 9.02(b)(A)(6)).

31. Section 9.02(b)(A)(6), however, carves out amendments that alter pro rata sharing of payments made "in connection with any transaction permitted under" Section 9.05(g), thereby expressly permitting such amendments with the consent of only Required Lenders. Section 9.05(g), in turn, provides: "Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations . . . to an Affiliated Lender on a non-pro rata basis . . . through open market purchases." In other words, open market purchases made by the Company "on a non-pro rata basis" are expressly permitted regardless of any other provisions in the Original Credit Agreements.

32. Notably, unlike many other credit agreements, the Original Credit Agreements do not contain an anti-subordination sacred right. That is, while the Original Credit Agreements generally contemplate pro rata sharing with respect to debt within the same "class," they do *not* restrict Robertshaw from subordinating the rights of one class of debt to another class of debt with approval of only the Required Lenders—though the parties could have chosen to adopt such a restriction had they wanted to.

**B. Robertshaw Faces Financial Headwinds.**

33. In the years following the execution of the Original Credit Agreements, Robertshaw began facing financial headwinds as a result of both macroeconomic and company-specific factors.

Beginning in 2020, Robertshaw, like many companies, dealt with a series of operational challenges arising from the onset of the COVID-19 pandemic, including lockdowns, supply chain disruptions, labor shortages, port closures, and higher freight charges.

34. Robertshaw initially weathered the storm caused by COVID-19, but the long-term impact eventually took its toll. By 2022, the effects of these issues—coupled with a spike in inflation—resulted in a decline in sales and a major reduction to Robertshaw's on-hand liquidity. Robertshaw acted thoughtfully and diligently to try to address these issues. It made sweeping changes to leadership and implemented new internal initiatives aimed at resolving certain operational challenges, re-developing long-term pricing strategies, and growing into new markets. Robertshaw also addressed ongoing delivery and quality issues and sought to reduce inventory and limit order changes. While these initiatives have shown promise and have had a positive impact on Robertshaw's business, the new measures took time to implement, and the cumulative effect of the headwinds Robertshaw faced caused a significant drop in revenue and substantially strained its liquidity.

### C. Robertshaw Enters Into The Super-Priority Credit Agreement And Amends The Original Credit Agreements With The Consent Of The Required Lenders.

35. As it became apparent that business headwinds would make it impossible for Robertshaw to timely service its debt under the Original Credit Agreements, Robertshaw, with the help of Latham & Watkins LLP as outside counsel ("**Latham & Watkins**"), began to explore its options for a financing transaction. Robertshaw made no secret of its need for liquidity; for example, on a December 2022 investor call, it disclosed that it had limited working capital and was struggling to satisfy its payable accounts.

36. Throughout the first quarter of 2023, Robertshaw and its investment banker, Guggenheim Securities ("**Guggenheim**"), contacted multiple potential third-party financing

sources to solicit proposals to refinance the Company's existing capital structure and provide Robertshaw with additional working capital. Various third parties submitted proposals for Robertshaw's consideration, including approximately nine term sheets submitted for a potential "dropdown" transaction. Notably, at least one of the Defendants submitted a proposal as well.

37. The Company and its advisors negotiated with multiple parties on potential terms. During this time, the Company, through Guggenheim and Latham & Watkins, actively engaged in conversations with the Original Lenders to explore financing alternatives. Robertshaw held discussions with Defendants and separately with the Ad Hoc Group, represented by Gibson, Dunn & Crutcher LLP and Greenhill & Co. After considering each option presented to find the option in the best interest of the Company, Robertshaw moved forward, on a non-exclusive basis, with a reputable global investment firm regarding its proposed dropdown transaction. This competition resulted in the Ad Hoc Group coming back with a new proposal (that ultimately led to the SPCA). At that time, the Ad Hoc Group consisted of the Lender Plaintiffs and Invesco. The Ad Hoc Group collectively held 76% of the First-Lien Loans and 59% of the Second-Lien Loans, and thus constituted Required Lenders under both of the Original Credit Agreements.

38. After considering all of its financing alternatives, and negotiating extensively with various lenders, including the Ad Hoc Group as well as third-parties, Robertshaw determined that the Ad Hoc Group's proposal was the best opportunity available to address Robertshaw's liquidity needs. Robertshaw engaged in a months-long, arm's-length negotiation with the Ad Hoc Group, culminating in the execution of the SPCA on May 9, 2023.

39. At closing, the Ad Hoc Group: (a) provided the Company with $95 million of new money under a first-out facility established under the SPCA; and (b) sold their existing First-Lien

and Second-Lien Loans to Robertshaw in exchange for new second-out and third-out term loans under the SPCA.

40. As part of the May 2023 Transactions, Robertshaw and the Ad Hoc Group also amended certain provisions of the Original Credit Agreements, including: (a) deleting certain affirmative and negative covenants, including Sections 5.01, 6.01, 6.02, and 6.05(b); and (b) amending the Original Credit Agreements' Default provisions to extend Robertshaw's cure period for an interest payment default to the maturity date.

41. Robertshaw offered *all* other Original Lenders under the Original Credit Agreements the opportunity to sell their existing holdings to Robertshaw at par for new loans under the Super-Priority Credit Agreement. Under this offer, other First-Lien Lenders could sell their holdings for second-out, third-out, and fourth-out term loans under the SPCA. Similarly, other Second-Lien Lenders could sell their holdings in exchange for fifth-out term loans under the SPCA. Many such First-Lien and Second-Lien Lenders chose to participate in the May 2023 Transactions. Original Lenders that, like Defendants, opted not to participate subsequently held debt junior to the debt issued under the SPCA (the "**Non-Participating Lenders**").

42. Neither the SPCA nor the amendments to the Original Credit Agreements altered any "sacred rights" that would have required approval from any minority lenders, including Defendants. Moreover, because the Original Credit Agreements contained no anti-subordination sacred rights, the Company, with the consent of the Required Lenders, was free to incur new indebtedness senior to the debt issued under the Original Credit Agreements.

**D. The Non-Participating Lenders File Suit In New York State Court.**

43. On November 29, 2023—more than six months after the May 2023 Transactions closed—Defendants initiated the Guardian Action in New York State Court against Robertshaw, Range Parent, One Rock, and the Ad Hoc Group. The complaint alleges, among other things, that

the May 2023 Transactions were invalid and violated the terms of the Original Credit Agreements. The amended complaint asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, and violations of New York Uniform Voidable Transactions Act in connection with the May 2023 Transactions. As relief in the Guardian Action, Defendants seek (a) a declaratory judgment that the SPCA is void and that an Event of Default has occurred under the Original Credit Agreements, (b) avoidance of certain transfers made and of liens and obligations incurred, (c) specific performance under the Original Credit Agreements, (d) money damages, and (e) indemnification from Robertshaw for Defendants' fees and costs in pursuing the litigation.

44. Specifically, in the Guardian Action, Defendants argue that the May 2023 Transactions violate three sacred rights provisions of the Original Credit Agreements: (a) Section 9.02(b)(A)(2), which prohibits the Company from entering into an agreement that "reduce[s] or forgives the principal amount of any Loan"; (b) Section 9.02(b)(A)(5), which prohibits any "change of the provisions of this Section [9.02] . . . to reduce any of the voting percentages required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder"; and (c) Section 9.02(b)(A)(6), which prohibits modification of certain other provisions, including Section 2.18(c), in a way that alters pro rata sharing of payments. Defendants further argue that because the amendments to the Original Credit Agreements are invalid, Robertshaw, through the Transactions, breached the terms of the Original Credit Agreements, including Sections 2.13, 5.01, 6.01, 6.02, and 6.05(b).

45. Defendants are wrong. With respect to the "sacred rights" provisions, the Company cannot have violated Section 9.02(b)(A)(2) of the Original Credit Agreements by entering into the SPCA because the SPCA does not reduce or forgive the principal amount of any loans incurred by

the Ad Hoc Group—indeed, the Ad Hoc Group incurred $95 million *in additional debt* when they executed the SPCA. Nor did the sale of the Ad Hoc Group's First-Lien and Second-Lien Loans in exchange for new second-, third-, fourth-, and fifth-out term loans constitute a "reduction" or "forgiveness" of their loans. Rather, the Ad Hoc Group sold their existing debt for new debt on a dollar-for-dollar basis. Following the sale, the Ad Hoc Group owned the same amount of second-out and third-out debt as they had previously owned in First-Lien and Second-Lien debt. Regardless, as discussed below, Section 9.05(g) permits debt-for-debt sales via open market purchases "[n]otwithstanding anything to the contrary contained" elsewhere in the SPCA. In other words, even if the May 2023 Transactions did reduce or forgive any principal amount of a loan (they did not), the Transactions were still permissible if they complied with Section 9.05(g). They did.

46. There has similarly been no violation of Section 9.02(b)(A)(5) of the Original Credit Agreements. The SPCA does not purport to change any provision of Section 9.02 to "reduce any of the voting percentages required to waive, amend or modify any rights" under the Original Credit Agreements. Nor would Robertshaw have needed to do so—it is indisputable that the Ad Hoc Group, which consented to the May 2023 Transactions, constituted Required Lenders under both Original Credit Agreements at all relevant times.

47. In their amended complaint, Defendants assert that Section 9.02(b)(A)(5) goes further, prohibiting any "change" to *any other* provision of Section 9.02 at all. Defendants claim that the amendments to the Original Credit Agreements "changed" Section 9.02(b)(A)(6), which requires the consent of adversely affected lenders to "amend or modify" Section 2.18 "in a manner that would by its terms alter the pro rata sharing of payments required thereby." But no language in Section 9.02(b)(A)(6)—or even in Section 2.18—was altered by the amendments to the Original

Credit Agreements. Moreover, Section 9.02(b)(A)(6) contained an express carve-out for transactions permitted under Section 9.05(g), namely "non-pro rata" "open market" purchases.[7]

48. This Court recently interpreted the term "open market purchase" in a provision identical to Section 9.05(g) of the Original Credit Agreements to mean "something obtained for value in competition among private parties." *In re Serta Simmons Bedding, LLC*, No. 23-90020, 2023 WL 3855820, at *11 (Bankr. S.D. Tex. June 6, 2023). The *Serta* Court also held that the term "open market purchase" is "clear and unambiguous" as a matter of law. *Id.* at *14-15. The Court found that the transaction entered into by Serta and certain lenders "constituted an 'open market purchase' under Section 9.05(g) of" the agreement at issue—in fact, finding it to be the "quintessential 'Wall Street' open market purchase"—because Serta solicited interest from various parties and negotiated at arms' length to achieve the greatest benefit for the debtors. *Id.*

49. Just as the transaction at issue in *Serta* "fell within the parameters of an open market purchase," the May 2023 Transactions also constituted an open market purchase under Section 9.05(g) of the Original Credit Agreements. Robertshaw engaged multiple third-parties and Original Lenders to the Original Credit Agreements in a competitive process to determine the best refinancing options available for the Company. Following arm's-length negotiations with multiple parties, Robertshaw determined that the Ad Hoc Group's proposal offered the Company the best deal and the best opportunity to continue operations going forward. This was a quintessential open market purchase.

[7] Section 9.05(g) of the Original Credit Agreements always permitted the Debtors to purchase Original Loans on a non-pro rata basis "through open market purchases," but to moot any dispute, the Section was amended to expressly allow purchase of Original Loans on a non-pro rata basis through "bi-lateral arrangements, exchange offers or other transactions . . . as otherwise consented to by the [Debtors]." This amendment was not necessary to effectuate the May 2023 Transactions, as the debt repurchases implemented as part of that transaction constituted "open market purchases" under the original terms of Section 9.05(g).

50. Defendants have also wrongly claimed in the Guardian Action that the May 2023 Transactions breached certain other provisions, including Section 2.13 (Interest), Section 5.01 (Financial Statements and Other Reports), Section 6.01 (Indebtedness), Section 6.02 (Liens), and Section 6.05(b) (Restricted Payments: Certain Payments of Indebtedness). It is indisputable that these provisions *are not* "sacred rights" under the SPCA. As such, under Section 9.02(b), Robertshaw needed only to obtain the consent of Required Lenders to "waive[], amend[] or modif[y]" those provisions. That is exactly what Robertshaw did. Specifically, the parties to the May 2023 Transactions amended the Original Credit Agreements to (a) extend Robertshaw's cure period for an interest payment default to the maturity date (thereby negating any breach of Section 2.13); and (b) remove Sections 5.01, 6.01, 6.02, and 6.05(b) in their entirety (thereby negating any breach of those provisions). Nor could Robertshaw's (and the Ad Hoc Group's) valid exercise of its broad amendment right under the carefully-negotiated SPCA or reasonable efforts to address its liquidity constraints constitute a breach of the implied covenant of good faith and fair dealing or a fraudulent transfer.

**E. Robertshaw Faces Further Headwinds And Files For Bankruptcy.**

51. Despite the capital infusion provided by the May 2023 Transactions, by late summer 2023, the Debtors once again faced a liquidity shortage caused by, among other things, continued operational and procurement issues, unrecovered inflation, and lower-than-expected revenues. Over the course of the fall and winter of 2023, Robertshaw made diligent efforts to secure additional financing that would permit it to continue operations and implement its turnaround plan. However, as described in more detail in the Debtors' First Day Declaration, the Debtors were ultimately unable to adequately address their liquidity needs through the open market and the Debtors were unable to avoid filing these Chapter 11 Cases.

52. The Guardian Action was automatically stayed as to Robertshaw and Range Parent pursuant to section 362 of the Bankruptcy Code upon commencement of these Chapter 11 Cases. *See* 11 U.S.C. § 362(a) (the automatic stay operates as a stay, applicable to all entities, of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [chapter 11]"). Plaintiffs believe that that automatic stay also extends to the Ad Hoc Group and One Rock, given that the claims in the Guardian Action either belong to the estate under the Bankruptcy Code or are intertwined with core issues under the Bankruptcy Code, as discussed in greater detail in the Debtors' accompanying Motion. Out of an excess of caution, the Debtors have also included claims here to extend the automatic stay to the claims against the non-Debtor parties in the Guardian Action or impose an injunction on the prosecution of those claims under the Court's broad powers to facilitate the orderly administration of the Debtors' estates.

53. Upon filing these Chapter 11 Cases, Robertshaw, Range Parent, and the Lender Plaintiffs simultaneously initiated this adversary proceeding to confirm the validity of the May 2023 Transactions in light of the Defendants' attempts to challenge such Transactions via the Guardian Action. While Plaintiffs are confident that the terms of the Original Credit Agreements permitted the May 2023 Transactions, Defendants contest the validity of the May 2023 Transactions. Whether the May 2023 Transactions were valid goes to the heart of the Debtors' efforts to reorganize their capital structure. This issue must be resolved for the Debtors to successfully emerge from chapter 11.

## COUNT I

### (Declaratory Judgment)

54. The allegations set forth above are incorporated herein by reference.

55. A real and justiciable controversy exists as to whether Robertshaw, Range Parent, and the Ad Hoc Group acted in accordance with the terms of the Original Credit Agreements with respect to the May 2023 Transactions. The permissibility of the May 2023 Transactions has been challenged by Defendants through the Guardian Action. Specifically, Defendants have alleged that: (a) the May 2023 Transactions breached various provisions of the First-Lien Credit Agreement and Second-Lien Credit Agreement; (b) the May 2023 Transactions breached the implied covenant of good faith and fair dealing; (c) the amendments to the Original Credit Agreements that were executed as part of the May 2023 Transactions are not valid and enforceable contracts; (d) an Event of Default has occurred under the First-Lien Credit Agreement and the Second-Lien Credit Agreement; and (e) certain payments made to the Ad Hoc Group pursuant to the May 2023 Transactions constitute fraudulent transfers under the New York Uniform Voidable Transactions Act. This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

56. Resolution of this controversy is necessary in order to, among other things, "determine the validity, priority, or extent of a lien or other interest in property" of the Debtors, pursuant to Bankruptcy Rule 7001(2), and to define Debtors' ongoing rights and obligations under the Original Credit Agreements.

57. There is no adequate remedy at law.

58. Accordingly, Plaintiffs seek an order declaring that: (a) neither Robertshaw nor Range Parent nor the Ad Hoc Group have breached any provision of the First-Lien Credit Agreement or Second-Lien Credit Agreement through the May 2023 Transactions or any other

action alleged by Defendants; (b) neither Robertshaw nor Range Parent nor the Ad Hoc Group have breached the implied covenant of good faith and fair dealing through the May 2023 Transactions or any other action alleged by Defendants; (c) the amendments to the First-Lien Credit Agreement and Second-Lien Credit Agreement that were executed as part of the May 2023 Transactions are valid and enforceable contracts; (d) no Event of Default has occurred under the First-Lien Credit Agreement or the Second-Lien Credit Agreement; and (e) no payments made by Robertshaw or Range Parent to the Ad Hoc Group pursuant to the May 2023 Transactions constitute fraudulent transfers under the New York Uniform Voidable Transactions Act.

## COUNT TWO

**(Extension of Automatic Stay Pursuant to Section 362 of the Bankruptcy Code)**

59. The allegations set forth above are incorporated herein by reference.

60. Upon the commencement of a bankruptcy case, the automatic stay operates as a stay, applicable to all entities, of "the commencement or continuation . . . of a judicial, administrative, or other action of proceeding against the debtor that was or could have been commenced before the commencement of the case under [chapter 11]," or "any act to obtain possession of property of the estate or of property from the estate  or toe exercise control over property of the estate." *See* 11 U.S.C. § 362(a)(1), (3).

61. "Any action to obtain possession of property from the estate or to exercise control over property of the estate" is automatically stayed under section 362(a)(3). Contracts, such as the amended Original Credit Agreements and the SPCA, are property of Debtors' estate. *See A.H. Robins*, 788 F.2d at 1001-02. The Guardian Action challenges the validity of amendments to the Original Credit Agreements and the SPCA. Robertshaw is a both a party to and the main beneficiary thereunder both the Original Credit Agreements and the SPCA.

62. If the stay is not automatically applicable, bankruptcy courts in this Circuit have the authority to extend the automatic stay to non-debtor third parties "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" *See Reliant Energy Servs. v. Enron Can. Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) (quoting *A.H. Robins*, 788 F.2d at 999). "An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *A.H. Robins*, 788 F.2d at 999 (affirming district court's order staying the proceedings against third-party defendants who were indemnified by the debtor); *see also Reliant Energy Servs.,* 349 F.3d at 825 (recognizing that contractual indemnification operates to create an identity of interests between a debtor and non-debtor).

63. Here, there is an identity of interests between Debtors and the Lender Plaintiffs named as defendants in the Guardian Action because of the contractual relationship between such parties, including specifically Robertshaw's obligation to indemnify the Lender Plaintiffs such that a judgment against them would, in effect, be a judgment against Robertshaw. *See, e.g.*, *In re Lomas Fin. Corp.*, 117 B.R. 64, 68 (S.D.N.Y. 1990) (finding that the bankruptcy court appropriately stayed an action against a non-debtor third party pursuant to § 362(a)(1) where the debtor was obligated to indemnify non-debtors with respect to claims in that action); *Am. Film Techs. Inc. v. Taritero (In re Am. Film Techs. Inc.)*, 175 B.R. 847, 853 (Bankr. D. Del. 1994) (extending the automatic stay to non-debtor directors and officers, in part, because "there is an entitlement to indemnification between the debtor and its officers and directors").

64. A bankruptcy court may also extend the automatic stay to a non-debtor when "a claim against the non-debtor will have an immediate adverse economic consequence for the

debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003). Prosecution of the Guardian Action against the Lender Plaintiffs and One Rock would burden or prejudice the Debtors who have an interest in the Guardian Action, adversely impacting Debtors' reorganization by distracting key company personnel during a critical time and depleting estate resources.

**COUNT THREE**

**(Injunction Pursuant to Section 105 of the Bankruptcy Code)**

65. The allegations set forth above are incorporated herein by reference.

66. Section 105(a) of the Bankruptcy Code permits bankruptcy courts to issue any order "necessary or appropriate" to assure the administration of the Debtor's bankruptcy estate, including issuing injunctions to extend the automatic stay to non-debtors. *See* 11 U.S.C. § 105(a); *Villarreal v. N.Y. Marine & Gen. Ins. Co. (In re OGA Charters, LLC)*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016). A bankruptcy court may enjoin a pending suit where, as here, "the non-debtor and the debtor enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor," or "the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995).

67. When implementing a temporary injunction to extend the automatic stay to non-debtors, courts consider: (1) if the movant is "likely to succeed on the merits," (2) if the movant is "likely to suffer irreparable harm in the absence of preliminary relief," (3) if the balance of equities tips in the movant's favor, and (4) whether granting the injunction "is in the public interest." *In re OGA Charters, LLC*, 554 B.R. at 424 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

68. Here, Robertshaw and Range Parent meet each of the four requirements for a preliminary injunction.

69. For the reasons discussed above in Count I, Robertshaw and Range Parent are likely to demonstrate that extension of the automatic stay is warranted under applicable case law in satisfaction of the first factor.

70. As to the second factor, an injunction is necessary to prevent irreparable harm to Debtors and their estates for three reasons. *First*, it is simply not possible for the Debtors to be bystanders to the Guardian Action—which puts the issue of whether amendments to the Original Credit Agreements and the SPCA is valid before the New York State Court—if the action moves forward against the Lender Plaintiffs and One Rock, given the significance of the action to the Debtors' estates and the concerns set forth above. *See In re Lomas Financial Corp.*, 117 B.R. at 67 (finding that debtor's reorganization efforts would be irreparably harmed if the suit against a non-debtor was not stayed because "[i]t [was] not possible for [the company] to be a bystander to a suit which may have a $20 million issue preclusion effect against it"). As such, without obtaining injunctive relief, the Debtors will be forced to defend against the Guardian Action, an action that goes to a central dispute in the Chapter 11 Cases, or else face irreparable harm in the form of losses to creditors and parties-in-interest, and the diversion of funds away from the estate given the Debtors' indemnification obligations. *See In re Acis Cap. Mgmt., L.P.*, No. 18-30212-SGJ (Bankr. N.D. Tex. July 10, 2018), ECF No. 21 (granting injunction as "necessary here to prevent imminent and irreparable injury in the form of substantial losses to creditors and parties-in-interest"); *In re LTL Mgmt., LLC*, 638 B.R. 291, 307 (Bankr. D.N.J. 2022) (finding that extension of the automatic stay to non-debtors was warranted where "continued litigation against the [p]rotected [p]arties would divert funds and resources toward defense costs and potentially disrupt the flow of funds

and resources" towards the debtors' estates). *Second*, continued prosecution of the Guardian Action would distract the Debtors' key employees and divert time and resources away from the Debtors' restructuring, potentially threatening the Debtors' ability to swiftly and efficiently resolve these Chapter 11 Cases. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (enjoining non-debtors from continuing lawsuit "[b]ecause the suit would ultimately divert the debtor's resources and attention from the bankruptcy process"). *Finally*, for the foregoing reasons, continuation of the Guardian Action against the Lender Plaintiffs and One Rock would frustrate the purpose of the automatic stay—to provide Debtors with a "breathing spell" to allow them to focus on the bankruptcy proceedings. *Matter of Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1182 (5th Cir. 1986).

71. In contrast to the immediate and irreparable harm the Debtors and their estates would face if injunctive relief were denied, the only potential harm faced by Defendants is mere delay caused by extending the automatic stay to the Guardian Action during the pendency of the Debtors' Chapter 11 Cases. Delay as a result of an injunction issued until bankruptcy proceedings are resolved is not a significant harm. *In re Lazarus Burman Assocs.*, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993). Moreover, the Debtors and the Lender Plaintiffs have separately initiated this adversary proceeding to efficiently and comprehensively resolve the claims raised by the Defendants in the Guardian Action, minimizing any harm from delay. Thus, the balance of equities weighs in Robertshaw's and Range Parent's favor.

72. As to the fourth factor, public interest favors an injunction, which would enable the Debtors to maximize the value of their estates and focus on successfully reorganizing in chapter 11—two paramount goals of the Bankruptcy Code.

73. For these reasons, Robertshaw and Range Parent submit that extension of the automatic stay is warranted to prevent Debtors and their estates from suffering irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court enter an order:

a) confirming through a declaratory judgment that:

   i. the May 2023 Transactions were permitted under the First-Lien Credit Agreement and Second-Lien Credit Agreement;

   ii. Plaintiffs have not breached the implied covenant of good faith and fair dealing;

   iii. the amendments to the First-Lien Credit Agreement and Second-Lien Credit Agreement, and the SPCA, executed as part of the May 2023 Transactions are valid and enforceable;

   iv. no Event of Default has occurred under the First-Lien Credit Agreement and the Second-Lien Credit Agreement; and

   v. no payments made by Robertshaw or Range Parent to the Ad Hoc Group pursuant to the May 2023 Transactions constitute fraudulent transfers under the New York Uniform Voidable Transactions Act;

b) declaring that the automatic stay already stays the Guardian Action under section 362 of the Bankruptcy Code as to the non-Debtor parties in the Guardian Action, or in the alternative, that this Court should extend the automatic stay under section 362 of the Bankruptcy Code to all of the non-Debtor parties in the Guardian Action, which includes One Rock Capital Partners LLC and the members of the Ad Hoc Group of Lenders;

c) enjoining the Guardian Action under section 105 of the Bankruptcy Code, as applicable to, all of the Non-Debtor Parties in the Guardian Action, which includes One Rock Capital Partners LLC and the members of the Ad Hoc Group of Lenders; and

d) granting such other and further relief as the Court deems just and proper.

Dated: February 15, 2024

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@HuntonAK.com
ashleyharper@HuntonAK.com
pguffy@HuntonAK.com

- and -

George A. Davis (NY Bar No. 2401214)
George Klidonas (NY Bar No. 4549432)
Adam S. Ravin (NY Bar No. 4079190)
Yelizaveta ("Liza") Burton*[8]
Eric F. Leon*
Kuan Huang*
Ryan Jones*
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: george.davis@lw.com
george.klidonas@lw.com
adam.ravin@lw.com
liza.burton@lw.com
eric.leon@lw.com
kuan.huang@lw.com
ryan.jones@lw.com

*Counsel to Debtors Robertshaw U.S. Holding Corp. and Range Parent, Inc.*

[8] **Pro hac vice* forthcoming.

Scott Greenberg*
C. Lee Wilson*
Jason Zachary Goldstein*
Alexis Perloff-Giles*
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: sgreenberg@gibsondunn.com
clwilson@gibsondunn.com
jgoldstein@gibsondunn.com
aperloffgiles@gibsondunn.com

- and -

Brenda L. Funk (Texas Bar No. 24012664)
John Cornwell (Texas Bar No. 24050450)
**MUNSCH HARDT KOPF & HARR, P.C.**
700 Milam Street, Suite 800
Houston, Texas 77002
Telephone (713) 222-5832
Email: bfunk@munsch.com
jcornwell@munsch.com

*Counsel to Bain Capital Credit, LP., Canyon Capital Advisors LLC, and Eaton Vance Management*